228 So.2d 723 (1969)
George E. CRAIG and James Sullivan
v.
J. K. (Woody) BURCH, d/b/a Burch Tire Company et al.
No. 7787.
Court of Appeal of Louisiana, First Circuit.
November 17, 1969.
Rehearing Denied December 22, 1969.
*725 Clifton Carl, New Orleans, for appellants.
Maurice Friedman, New Orleans, for appellees.
Before LANDRY, SARTAIN and ELLIS, JJ.
LANDRY, Judge.
Plaintiffs appeal the judgment of the trial court denying recovery of damages resulting from an automobile accident allegedly caused by a defectively recapped tire purchased from defendant, J. K. (Woody) Burch, d/b/a Burch Tire Company (Burch). The trial court found the tire was in fact defective but that the negligence of plaintiff driver, George E. Craig, was the sole proximate cause of the accident. On this basis, Craig and his guest passenger, James Sullivan, were denied recovery, hence this appeal. We disagree with the determination that plaintiff Craig's negligence was the sole proximate cause of the accident. We therefore reverse and render judgment for appellants.
Montgomery Ward, original retailer of the recapped tire, and Gates Rubber Company, tire manufacturer, were also made defendants. Plaintiffs have not prosecuted their appeals as to these defendants. Consequently, Burch is the sole appellee herein.
On January 8, 1966, Burch sold Craig three recapped tires. Burch mounted the tires on Craig's 1957 Oldsmobile, one on *726 the right front wheel, and inflated them to 32 pounds pressure. On January 16, 1966, Craig was proceeding in his vehicle from New Orleans to Angola, Louisiana, accompanied by his guests, Sullivan and one Emma Morgan. Sullivan occupied the right side of the front seat; Mrs. Morgan was sitting in the middle. The accident occurred on Highway 61, approximately 8 miles north of Baton Rouge. It is conceded the recap on the right front tire of Craig's car became separated from the tire carcass. Craig, upon hearing a bumping noise and feeling his car pull to the right, cut sharply to his left. The vehicle went out of control and overturned.
Appellants contend the accident occurred solely due to the failure of the recap. Appellee maintains the tire was properly recapped and that the accident occurred solely because of Craig's fault in (1) traveling at an excessive speed; (2) acting unreasonably by "snatching" his vehicle to the left causing him to lose control, and (3) allowing Mrs. Morgan to interfere with his driving ability by leaning on Craig while he was driving.
Craig testified he was traveling northerly on a two-lane, paved highway at a speed between 65 and 70 miles per hour under normal weather conditions. Suddenly his right front tire made several "bounces" giving forth a "Bloomp, Bloomp, Bloomp" sound and his vehicle veered sharply to the right onto the right shoulder of the road. Craig then pulled the steering wheel to his left to correct the vehicle's course. The automobile went out of control, skidded sideways down the highway, struck a culvert, overturned completely and landed upright on its wheels. It is undisputed that following the accident, the recap was found to have separated from the tire carcass. Craig denied Mrs. Morgan was asleep with her head on his shoulder at the time of the accident.
Mrs. Morgan's testimony was simply that she was asleep with her head on Sullivan's left shoulder. She awoke while the car was overturning in the air and recalled nothing further pertaining to the mishap.
Plaintiff Sullivan in essence corroborated Craig's testimony regarding the speed of the vehicle at the time of the accident. Sullivan stated further that he heard a noise made by something striking the right front fender of the car. He also testified that Craig's corrective maneuver was made after the tire made about two "bloops". He was of the opinion Craig could not help losing control of the vehicle.
James B. Howard, state trooper, arrived at the scene approximately two minutes after the accident occurred. He observed that the right front tire of plaintiff's vehicle was still inflated but that the recap tread was separated from the carcass. Trooper Howard stated the posted speed limit was 60 miles per hour. He observed skidmarks beginning in the northbound lane curving westerly into the west ditch, thence in the ditch to a culvert, across the culvert head to where the vehicle came to rest. For a distance of about thirty feet there were no skid marks because the vehicle was airborne. Trooper Howard believed the car turned completely over in the air and landed on its wheels. He found no damage to the vehicle. According to Howard, the right front wheel skidded 241 feet, the right rear 263 feet, the left front 67 feet and the left rear 56 feet. The import of the Trooper's testimony is that the vehicle skidded 49 feet on the left shoulder of the road, continued broadside 79 feet in the drainage ditch, struck the culvert, flipped over and traveled an additional 105 feet to its resting place. The Trooper found no skid marks on the right shoulder of the road.
Narration of the procedure employed in recapping tires is believed essential to a proper understanding of the question of alleged negligence and breach of warranty in selling plaintiff Craig a defectively recapped tire. It appears that tires selected for recapping should be chosen only after careful inspection for cuts, holes, breaks and other imperfections. If the carcass *727 has any significant holes or breaks, they are repaired; if unrepairable, the carcass is discarded and not used. Because extreme heat is used in the recapping, it is of the utmost importance that all tires be thoroughly dried before the process is begun. This is so because if moisture, vegetation or other foreign matter is allowed to remain in holes or cuts in the carcass, the heat applied in recapping causes steam or gas to form in the holes or cuts resulting in what is called a "mold blow", which is a separation between the tread and carcass. After the tire is inspected and dried, it is then buffed with an electrical machine to remove all excess rubber from the carcass and smooth its surface for application of the recap tread. An adhesive is then applied to affix the "camel back", a trade name for the recap rubber. The tire, with a tube inside, is then placed in a mold. The tube is inflated to maintain the tire's shape and insure a good bond between carcass and camel back. The tire is then subjected to heat of approximately 300 which binds the tread to the carcass. When this process is completed, the tire is immediately inspected, while still hot, for possible mold blow which will appear in the form of a bump or blister on either the inside or outside of the carcass. When a tire cools, blisters resulting from mold blow gradually disappear as the tread and carcass still remains. It is conceded that tires awaiting recapping tend to sweat in storage. Standard procedure dictates that tires be dried in a specially constructed drying room before being recapped.
Charles M. Strader, a recognized recapping expert, testifying in plaintiffs' behalf, stated the tire in question suffered a mold blow. He readily pointed to a cut which he found responsible for the failure. He was of the opinion proper examination while the tire was still hot should have disclosed this abnormality. Mr. Strader expressed the view that tires to be recapped should be stored in a room having proper ventilation to allow thorough drying and that proper procedure required that tires be dry or dried before recapping. He explained that recaps are designed to operate at highway speeds and that the accident in question would not produce the separation that occurred. He also stated that a separation involving 360 of tread, as in this case, would give only a split second warning and would develop in less than 100 feet of highway travel. In addition, Mr. Strader questioned the advisability of recapping this particular tire upon finding it was "pretty old". In Strader's opinion, the skidding of the vehicle and its overturning had no connection with the separation of the tread from the tire.
Everett H. Gibbs, recapping expert, called on behalf of defendant, testified the tire in question had little mileage since being recapped. He also found the tire had not run very long with the separation before the tread came off. He was of the view the cut identified by Strader was probably the origin of the tread separation. Mr. Gibbs conceded a purchaser may reasonably expect a recapped tire will perform safely at highway speeds but that normal highway speeds sustained sufficiently long could produce sufficient heat to cause a mold blow. Gibbs agreed with Strader's conclusion that the skidding and overturning of Craig's car did not cause the tire failure. Based on tire age and evidence of former repair, Gibbs considered that perhaps the carcass should have been rejected for recapping. He stated that 200 of heat are generated by a tire going 70 miles per hour but that in the recapping process heat up to 300 was used. He indicated the tire had a mold blow. Mr. Gibbs also stated a recapped tire with a mold blow would bump if placed on a car while still hot, but if allowed to cool before being used, it would ride smoothly.
Woods Burch, defendant's brother and shop foreman, testified he inspected all tires for recapping and would pass those having a small nail hole but reject those having tread cuts, breaks or cracks. He agreed that if the tire in question had a tread cut, it should have been rejected if the cut were one that could be found. He *728 could not, however, after examining the tire in court, locate the cut previously identified by Strader and Gibbs. At one point Mr. Burch indicated it was his policy to caution purchasers that recapped tires were unsafe for highway driving. He did not, however, make the sale to plaintiff and does not know whether some other employee so warned Craig. This testimony, however, is inconsistent with his admission that he believed such tires safe because he used them himself. Mr. Burch also testified his recaps are never sold hot and that sales usually take place after from two to four weeks storage. Additionally he admitted his plant had no special drying room or apparatus. He explained that tires were stored either in the boiler room or a shed attached to the establishment. Each tire was merely visually inspected and if found to be wet, was allowed to dry before processing began.
We agree in the trial court's conclusion that defendant was responsible for the tire's failure on the dual basis of negligence in performing a faulty recapping process and breach of the vendor's implied warranty of fitness of the article sold.
The vendor warrants the thing sold to be fit for its intended purpose. Dougherty v. Petrere, 240 La. 287, 123 So.2d 60. LSA-C.C. Article 2476, provides that the warranty against hidden defects and redhibitory vices is implied in every contract of sale, unless expressly excluded. Radalec, Incorporated v. Automatic Firing Corp., 228 La. 116, 81 So.2d 830.
The defect in the tire in question was hidden. It was one not discoverable by the purchaser upon reasonable inspection. This conclusion is warranted when it is recalled that a separation would only become manifest by bumping in the event the tire were used while still warm from the recapping process. Nor do we find warranty was expressly disclaimed.
The degree of care owed increases in relation to the danger inherent in a given situation. Culpepper v. Leonard Truck Lines, Inc., 208 La. 1084, 24 So.2d 148; Barret et al. v. Caddo Transfer & Warehouse Co., Inc., 165 La. 1075, 116 So. 563, 58 A.L.R. 261. The danger incident to providing a motorist with an unsafe tire is obviously great. The care displayed in this instance falls short of discharging the duty owed.
We find that defendant Burch breached his warranty in negligently recapping a carcass too old for such purposes, failing to properly dry the tire in question, failing to discover a defect which should have prompted rejection of the tire sold plaintiff, and failing to have proper drying facilities in his establishment.
We come to the pivotal issue in this cause, namely, the alleged negligence of plaintiff Craig. The question of his alleged culpability for failure to anticipate failure of the recap admits of ready disposal. The record is barren of evidence that Craig either knew or was warned or informed that recapped tires were unsafe for driving at legal highway speeds. Moreover, the testimony of the experts Strader and Gibbs is to the effect recaps are safe at maximum legal speeds which we judicially note to be 70 miles per hour on some highways in this state.
However, Craig's alleged negligence in traveling at excessive speed and imprudently reacting to the emergency presented, are issues not so simply resolved. Cases are legion in our law that negligence constituting the proximate cause of an accident imposes liability on the defendant. Pelloat v. State Through Department of Highways, La.App., 198 So.2d 674. By the same token, a plaintiff guilty of negligence proximately causing an accident (contributorily negligent) is denied recovery from a defendant who is also guilty of negligence proximately causing the accident. Hoover v. Wagner, La.App., 189 So.2d 20. We believe cases of this nature can be more properly adjudicated when the alleged negligence of the defendant or *729 contributory negligence of plaintiff are considered in the light of four basic concepts, namely: (1) duty of care owed; (2) breach of the duty of care; (3) whether the breach of duty found is a cause in fact of the accident, and (4) proximate cause. Authorities are in unanimous agreement that the question of duty of care owed is determined in view of two elementary factors: (1) Does plaintiff have an interest which is protected at all, and (2) is plaintiff's interest protected against the type of conduct with which he can charge defendant? In determining breach of duty, the question is the reasonableness of the care taken by defendant in the light of the attending circumstances including the interest of the plaintiff and the social utility of defendant's conduct.
Cause in fact is a purely factual inquiry which poses the "but for" test, meaning but for defendant's action the accident would not have occurred. If this inquiry is answered affirmatively, the action of the defendant (or plaintiff charged with contributory negligence) is a cause in fact of the accident. Stated otherwise, a cause in fact is the sine qua non of the accident, an indispensable antecedent without which the accident would not have occurred. Arnold v. Griffith, La.App., 192 So. 761.
We note that in Dixie Drive It Yourself System New Orleans Co. v. American Beverage Company, 242 La. 471, 137 So.2d 298, the Supreme Court has added the "substantial factor" test as a means of determining cause in fact. The rule there stated is that negligence is a cause in fact if it was a substantial factor in bringing about the injury.
Liability does not attach unless the conduct complained of is a cause in fact, i. e., it must bear a causal connection in fact to the occurrence of the accident. Arnold v. Griffith, above.
The converse is not necessarily true in that every cause in fact does not necessarily impose liability upon the perpetrator.
The cause in fact test poses the issue what would the consequences have been if defendant had not acted? To establish his cause of action, plaintiff must answer this inquiry by establishing that, more probably than not, the accident would not have occurred but for defendant's action. Stated otherwise, plaintiff must show a more than 50% chance there would have been no accident except for defendant's conduct. Perkins v. Texas & New Orleans Railroad Co., 243 La. 829, 147 So.2d 646; Lawson v. Continental Southern Lines, Inc., La.App., 176 So.2d 220.
Proximate cause, however, is not a factual consideration. It is a legal tool, a legislative and judicial policy. Dartez v. City of Sulphur, La.App., 179 So.2d 482. From time immemorial courts have customarily applied two well known tests in determining proximate cause. These are: (1) Was the accident the natural and probable consequences of defendant's act, and (2) Were the results of defendant's conduct reasonably foreseeable? As thusly applied, it appears the proximate cause concept has been employed by the courts to extend or restrict liability at the court's discretion depending upon the circumstances of each case rather than on the basis that the action of the defendant was or was not a cause in fact of the accident. Such application is one of policy as evidenced in cases where the negligent defendant is not held for all losses causally related to his negligent act but only those that are the result of the force he set in motion while that force is of substantial moment. Harvey v. Great American Indemnity Co., La.App., 110 So.2d 595; Encyclopedia of Automobile Law and Practice, Section 2532.
Proximate cause presupposes breach of a duty constituting a cause in fact of the accident. Dartez v. City of Sulphur, La.App., 179 So.2d 482. When considering proximate cause in connection with a statutory violation, the basic inquiry is what kind of risk or risks does the statute seek to protect against? Dixie *730 Drive It Yourself System New Orleans Co. v. American Beverage Co., 242 La. 471, 137 So.2d 298. Stated otherwise, proximate cause involves a determination of what statutory duties extend to what risks. In the absence of statutory duty, proximate cause is determined in the light of the query whether plaintiff's particular interest is protected against defendant's particular conduct. Dartez v. City of Sulphur, above. It appears, therefore, proximate cause is but a third facet of the duty formula utilized as a means of determining when liability attaches to a cause in fact or to one or more of several causes in fact. Bennett v. Sears, Roebuck & Company, La.App., 183 So.2d 757; 65 C.J.S. Negligence § 104, page 1135.
The term proximate cause must be used with caution because it does not concern an inquiry into cause. Rather it involves an inquiry into duty, more particularly, the extent of defendant's duty with respect to plaintiff's interest to be protected.
The court below accepted the skidmarks and the damage to the culvert struck by plaintiff's automobile as evidence of excessive speed. However, skidmarks and physical damage do not, standing alone constitute proof of excessive speed under all circumstances. See Picard v. Joffrion, La.App., 202 So.2d 372; Chiasson v. Connecticut Fire Insurance Company, La.App., 144 So.2d 726, and Lucas v. Broussard, La. App., 197 So.2d 696. We find defendant has failed to bear the burden of proof as regards the plea of contributory negligence.
As previously shown, breach of duty is a cause of fact if either the accident would not have occurred but for the alleged breach or if the breach were a substantial factor in causing the accident. Applying the test to the case at hand, the question is would the accident not have occurred but for Craig's breach of duty: The answer is that it would have. This conclusion is justified in view of the expert testimony that (1) the speed did not cause the tire failure; (2) the failure could just as well have happened at 60 miles per hour, and (3) that recaps are at least impliedly warranted to be safe at maximum highway speeds of up to 70 miles per hour. Since Craig's breach of duty was not a cause in fact of the accident, it could not be a proximate cause thereof. There being no causal connection between Craig's fault and the occurrence of the accident, he must be deemed free from contributory negligence. American Road Insurance Company v. Irby, La. App., 203 So.2d 427.
Craig's alleged negligent reaction to the emergency is not supported by the testimony. A motorist faced with a sudden emergency, not of his own creation, is not required to react as a reasonably prudent driver under ordinary conditions permitting calm, unhurried decision. All that is required in such instances is a response reasonably to be expected of an ordinarily prudent motorist under similar circumstances. Wallace v. Travelers Insurance Company, La.App., 195 So.2d 712.
Craig and Sullivan both testified that only a brief interval elapsed between the onset of the emergency and Craig's loss of control. Their evidence is confirmed by that of the expert Strader who testified a mold blow gives only a split second warning and develops in less than 100 feet of highway travel. Craig reacted to the sudden swerve of his vehicle to the right by turning the wheel sharply to the left. We believe such reaction is to be expected of a reasonably prudent driver under similar circumstances especially since the vehicle in question was in danger of leaving the highway when the corrective measure was attempted. The skidmarks at the scene represent a braking attempt on the part of the driver. The longer skidmarks made by the right front and rear tires indicate the car braked unevenly. To hold that a reasonably prudent driver could have maintained control of the vehicle under such circumstances is to engage in sheer speculation. We find no breach of Craig's duty to react as a reasonably prudent motorist under the circumstances.
*731 We find defendant's conduct was a cause in fact, an indispensable element without which the accident would not have happened. It was also the sole proximate cause of the mishap. Plaintiff had the legal right to rely upon defendant's warranty that the tire was free of defects and was safe for driving under the conditions involved in this instance. Defendant's duty was to furnish a tire free of latent defects. This obligation extended to the risk of a tire failing at the speed at which plaintiff in this case was traveling. Defendant is charged with knowledge that a mold blow in a recapped tire could be anticipated to fail and precipitate an accident under the circumstances obtaining herein.
Neither appellant produced any medical proof of injuries save and except hospital and medical reports.
Plaintiff Craig testified he sustained two fractured ribs of which one was allegedly broken, and also injury to the nerves in his neck, shoulder and right arm. Records in evidence indicate he was hospitalized for X-rays and was administered injections incurring costs of $55.00. He was transferred by ambulance to a second hospital where he remained two days and subsequently received treatment as an outpatient at a cost of $245.00. X-rays of his chest, neck and back on January 17, 1966, proved negative. It further appears he complained of neck and back pain and suffered tenderness of the ribs on January 17, 1966. Symptoms of whiplash injury were noted on January 25, 1966. On February 10, 1966, his complaints of pain were minimal. Mr. Craig testified he was a part time employee of Sullivan's Trim Shop doing piece work which netted him $45.00 to $90.00 weekly. He allegedly lost six weeks employment. In view of the nature of his injuries, we think an award to plaintiff Craig in the sum of $1,250.00 will be ample compensation for his pain and suffering.
Plaintiff must prove with legal certainty every item of damages claimed. Foggin v. General Guaranty Insurance Company, La.App., 207 So.2d 176. Since plaintiff Craig neither repaired his vehicle nor offered competent evidence to establish the damage thereto, no recovery can be allowed for this item. LeBlanc v. Jordy, La.App., 10 So.2d 64.
As a general rule plaintiff's detailed and uncorroborated testimony as to lost earnings may, if reasonable and accepted, support an award for such damages, but not where corroborative evidence is shown to be available and is not produced. Stevens v. Dowden, La.App., 125 So.2d 234. We find plaintiff's testimony somewhat vague and uncertain as to alleged total earnings. No attempt at corroboration was made; neither was it shown that corroboration was unavailable. Under the circumstances we deny recovery of this item. In addition to the award for personal injuries, Craig is entitled to recover proved special damages of $300.00. A claimed ambulance expense of $15.00 is unsupported in the record and therefore denied.
Plaintiff Sullivan sustained a bruised and swollen leg and a chipped coccyx. He was X-rayed at a Baton Rouge Hospital and received treatment at New Orleans Charity Hospital, New Orleans, in the sum of $38.00. He testified his leg was painful for about two to three weeks and for about the same time his back bothered him when he sat. We find an award of $500.00 will adequately compensate him for these injuries. Sullivan testified that although he was not a union member, he worked about two or three days weekly as a longshoreman earning $3.52 hourly for at least 8 hours each day. He conceded he was employed only when there were no union members available. He offered no corroboration whatsoever as to his alleged lost earnings. We therefore deny this item.
Accordingly, it is ordered, adjudged and decreed the judgment of the trial court rejecting plaintiffs' demands be and the same is hereby reversed and set aside.
*732 It is further ordered, adjudged and decreed there be judgment herein in favor of plaintiff George E. Craig and against defendant J. K. (Woody) Burch, d/b/a Burch Tire Company, in the sum of $1,550.00, together with legal interest from date of judicial demand, until paid.
It is further ordered, adjudged and decreed that there be judgment herein in favor of plaintiff James Sullivan and against defendant J. K. (Woody) Burch, d/b/a Burch Tire Company, in the sum of $538.00, together with legal interest thereon from date of judicial demand, until paid. All costs of these proceedings to be paid by defendant J. K. (Woody) Burch, d/b/a Burch Tire Company.
Reversed and rendered.